NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Request of the Governor and Council
No. 2018-0267

OPINION OF THE JUSTICES
(Definition of Resident and Residence)

Submitted: May 31, 2018
Opinion Issued: July 12, 2018

On May 16, 2018, the Secretary of State transmitted to the chief justice and the associate justices of the supreme court a certified copy of a resolution of the Governor and Executive Council dated the same date requesting an opinion of the justices regarding House Bill (HB) 1264, an act amending the definition of "resident" and "residence" in RSA 21:6 and RSA 21:6-a. The act has been approved by the New Hampshire House of Representatives and the New Hampshire Senate, and is currently pending in the enrolled bills process, upon completion of which the bill will be placed before the Governor for his action. The Governor and Executive Council have requested that the justices give their opinion on the following questions of law:

"I. By subjecting those who are domiciled in New Hampshire for voting purposes to the same legal requirements as those who are residents of New Hampshire, including but not limited to the requirements to take actions required by RSAs 261:45 and 263:35 and to pay any fees or taxes associated therewith, would House Bill 1264, on its face, violate any of the following provisions of the New Hampshire or United States Constitutions?

(a) The Equal Protection Clause of Part I, Article 2 of the New Hampshire Constitution.

(b) Part I, Article 11 of the New Hampshire Constitution.

(c) The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

II. By subjecting those who are domiciled in New Hampshire for voting purposes to the same legal requirements as those who are residents of New Hampshire, including but not limited to the requirements to take actions required by RSAs 261:45 and 263:35 and to pay any fees or taxes associated therewith, would House Bill 1264, as applied to students attending a postsecondary institution within the State of New Hampshire who currently claim New Hampshire as their domicile for voting purposes but who do not claim New Hampshire as their residence, violate any of the following provisions of the New Hampshire or United States Constitutions?

(a) The Equal Protection Clause of Part I, Article 2 of the New Hampshire Constitution.

(b) Part I, Article 11 of the New Hampshire Constitution.

(c) The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution."

*To the Honorable Governor and Council:*

Upon receipt of the request, we invited interested parties to submit memoranda addressing the above questions. The undersigned justices of the Supreme Court return the following separate replies to the questions presented in your resolution.

OPINION OF CHIEF JUSTICE LYNN AND JUSTICES HANTZ MARCONI AND DONOVAN

Having reviewed these submissions and fully considered the issues, we conclude that the request constitutes a proper circumstance for us to issue an advisory opinion. Accordingly, we respectfully return our response that all of the certified questions must be answered in the negative.

I. Propriety of an Advisory Opinion

Part II, Article 74 of the New Hampshire Constitution provides: "Each branch of the legislature as well as the governor and council shall have authority to require the opinions of the justices of the supreme court upon important questions of law and upon solemn occasions." As we have often noted, this provision of the constitution empowers the justices of this court to render advisory opinions "only in carefully circumscribed situations." Duncan

2

v. State, 166 N.H. 630, 640 (2014). Several interested parties urge us to decline to issue an advisory opinion. Two arguments are advanced in support of this position. First, it is argued that, because the Governor alone, rather than the Governor and Council, has the exclusive authority to take action with respect to HB 1264, by signing it, vetoing it, or allowing it to become law without his signature, see N.H. CONST. pt. II, art. 44, the Governor and Council, as a body, has no interest that will be advanced by any advice given by the justices in an advisory opinion. We find this argument unpersuasive.

We acknowledge that we have not previously been asked for an advisory opinion in a situation the same as that presented here. However, we have previously answered questions in analogous circumstances. In Opinion of the Justices, 96 N.H. 513 (1949), the majority of the justices provided their opinion, at the behest of the Governor and Council, concerning the constitutionality of measures proposing the reorganization of agencies of the executive branch of state government. Opinion of the Justices, 96 N.H. at 513-14. The legislation authorizing the reorganization called for the Governor — with the assistance of advice from a special commission, but without the concurrence of the Council — to adopt the measures, which would then become law unless disapproved by concurrent resolution of both houses of the legislature. Id. In providing our response, we observed that "the questions submitted in the resolution of the Governor and Council pertain to their executive duty." Id. at 514. That being the case, we submitted our answers "upon the assumption that our opinion may be of use to you in the performance of the duties legally imposed upon you." Id. (quotation omitted). We made a similar assumption as to the usefulness of our answers to the functioning of the executive branch in Opinion of the Justices, 113 N.H. 87 (1973), where the questions submitted by the Governor and Council pertained to the constitutionality of a footnote that the Governor, without Council involvement, proposed to include in the budget he submitted to the legislature. See Opinion of the Justices, 113 N.H. at 88-89; see also Opinion of the Justices, 79 N.H. 535 (1919).

Although we remain sensitive to the importance of confining our advisory opinions to solemn occasions, we are satisfied that the request here comports with the requirements of Part II, Article 74. The Governor has the constitutional responsibility to approve or veto HB 1264 or allow it to become law without his signature. He has expressed concerns as to its constitutionality and, with the concurrence of the Council, whose role, inter alia, is to serve as advisor to the Governor, has sought our guidance to aid him in making his decision. Under these circumstances, we believe it is our duty to answer the questions submitted.

The other argument advanced in support of our declining to answer the questions is that we have insufficient information to do so because providing answers regarding voting rights issues requires factual development that can

3

only occur in the context of a fully litigated case. In support of this position, the opponents of HB 1264 rely primarily on our decision in Opinion of the Justices (Domicile for Voting Purposes). In that case, we asked to be excused from answering a request for an advisory opinion from the New Hampshire House of Representatives on a bill proposing to amend the definition of domicile for voting purposes. Opinion of the Justices (Domicile for Voting Purposes), 167 N.H. 539, 541 (2015). As grounds, we observed that deciding what level of scrutiny to apply to the proposed legislation would require us to determine the extent of the burden which the measure imposed on the right to vote. See id. at 542. Because that determination was a factual question, we concluded that it could not be resolved in the context of an advisory opinion. Id. We also noted that there was then pending before this court a litigated case, Guare v. State of New Hampshire, "with a factual record developed over two years" that raised similar legal issues to those raised by the House in its request. Id. at 542-43.

Significantly, however, in subsequently addressing the merits of the appeal in Guare, we did not find it necessary to rely upon any factual findings made by the trial court in that case. See Guare v. State of N.H., 167 N.H. 658 (2015). To the contrary, the appeal was based upon the trial court's summary judgment ruling — in which the trial court was not permitted to resolve factual disputes — in favor of the parties who challenged the legality of the voter registration form at issue. Id. at 659-60. As we specifically observed, "the trial court's ruling was not based upon applying the challenged language to the particular facts and circumstances of this case." Id. at 661. Accordingly, we treated the court's decision as "a determination that the language is facially unconstitutional," and thus subject to de novo review by this court. Id. We then explained that the language used in the form was confusing, in that, on its face, it was "susceptible of different interpretations." Id. at 664.[1]

More importantly, we found it unnecessary to determine, based on any particular facts developed in the trial court, either the extent of the burden the form's language imposed on voting or the level of scrutiny to which it was subject. See id. at 665. Rather, we assumed that the burden on voting was not severe and therefore that the strict scrutiny test did not apply. Id. Applying intermediate scrutiny, we held that, because the language on the form was "confusing and inaccurate," and therefore "could cause an otherwise qualified voter not to register to vote in New Hampshire," it imposed an unreasonable burden on the right to vote as a matter of law and therefore violated Part I, Article 11 of the State Constitution. Id. at 665, 669.

---

[1] We did point to testimony of several of the petitioners in Guare that they were confused by the language of the form. But because we did not indicate that the trial court had made any findings of fact regarding such testimony, that testimony could not have formed the basis for our review of the court's ruling on summary judgment.

4

Consistent with the above discussion, we conclude here that we are able to answer the questions submitted despite the absence of a factual record. As we explain below, HB 1264 has no effect on eligibility to vote, and even if we assume that its collateral consequences will discourage from voting in New Hampshire some or all of those affected by the change in the law of residence for other purposes, the bill serves the compelling state interest of insuring that those allowed to vote in this state share a community of interest with the population generally. Therefore, the bill satisfies constitutional standards even if, as we also assume without deciding, it is subject to the most exacting standard of review.

In their separate opinion, our colleagues decline to answer the submitted questions on two grounds. First, with respect to questions I(a) through (c), while willing to assume that HB 1264 serves the compelling state interest in insuring that those allowed to vote in this state share a community of interest with the population generally, they assert that, without a factual record, they are unable to assess whether HB 1264 is "'narrowly drawn' to serve that interest." Yet they fail to explain what facts could require the legislature to more narrowly tailor HB 1264 than to make the legal standard for domicile for voting purposes equal to the legal standard for residence for other purposes — unless the State or Federal Constitution requires New Hampshire to maintain a special, more relaxed legal standard for domicile for voting purposes only, a proposition that, as explained below, fails as a matter of law.

Second, our colleagues assert an inability to answer questions II(a) through (c) because, they claim, there is a factual dispute as to the purpose of the legislation and one such purpose could be improper. However, even if an improper legislative purpose could be grounds for invalidating HB 1264 — which, as we explain below, it is not — we presume legislative enactments to be constitutional. See Opinion of the Justices (Requiring Att'y Gen. to Join Lawsuit), 162 N.H. 160, 164 (2011). Accordingly, to decline to give the Governor and Council our opinion on the constitutionality of HB 1264 based on the mere possibility that such a motive might exist is fundamentally at odds with our precedents establishing the applicable standard of review. See id.

Furthermore, our colleagues assume that questions II(a) through (c) should be treated as though they seek our opinion regarding a specific individual's special circumstances. But, unlike a typical as-applied challenge, these questions do not ask about any circumstances more specific than the general application of HB 1264 to the at-large population of students attending postsecondary educational institutions in New Hampshire who currently claim New Hampshire as their "domicile" for voting purposes but not as their "residence" for other purposes. The questions do not ask for our opinion as to how the statute might apply to the circumstances of any particular student or students, nor could we opine about the same without a factual record. See Opinion of the Justices, 129 N.H. at 290, 295 (1987). Rather, fairly

understood, questions II(a) through (c) ask us to opine only as to whether there is anything about the status of being a "student" that would render application of HB 1264 to such persons unconstitutional. To provide answers to these questions, we need to know nothing more than the facts postulated in the questions themselves. Cf. Newburger v. Peterson, 344 F. Supp. 559, 560 (D.N.H. 1972) (observing that, although the plaintiff class comprised of all students subject to New Hampshire's then-existing statute for voting was properly certified, it was "not the most comprehensive" class because it did not include "all [persons] who would be permitted to register [to vote] but for their firm intention to leave at a fixed time" (emphasis added)).

For the above reasons, we respectfully disagree with our colleagues and conclude that we are duty bound to answer the questions propounded by the Governor and Council.

## II. The Merits

### A. Background

The distinction between the concepts of "residence" and "domicile" is deeply engrained in American law. A person's residence is generally understood to be the place where he or she is currently living, even if only for relatively short duration, whereas a person's domicile is the place with which the person "identifies himself and all his interests" and there "exercises the rights and performs the duties of a citizen." Bergmann v. Board of Regents, 892 A.2d 604, 626 (Md. Ct. Spec. App. 2006) (quotations omitted). Domicile is thus universally understood to connote a more significant and lasting connection with a locality than is encompassed by mere residence, supporting the conclusion that "one . . . may have more than one residence at the same time, but only one domicile." 28 C.J.S. Domicile § 5 (2008); see Restatement (Second) of Conflict of Laws § 11(2) (1988) (explaining that "[e]very person has a domicile at all times and, at least for the same purpose, no person has more than one domicile at a time"). To the same effect, we have described domicile as consisting of actual residence coupled with an intention to remain. Felker v. Henderson, 78 N.H. 509, 512 (1917).

Despite the difference in meaning, the terms "domicile" and "residence" are frequently used synonymously. 28 C.J.S. Domicile § 5. Prime examples of this are RSA 21:6 and :6-a, entitled, respectively, "Resident; Inhabitant" and "Residence," which provide:

> **Resident; Inhabitant**. A resident or inhabitant or both of this state and of any city, town or other political subdivision of this state shall be a person who is domiciled or has a place of abode or both in this state and in any city, town or other political subdivision of this state, and who has, through all of his actions,

6

demonstrated a current intent to designate that place of abode as his principal place of physical presence for the indefinite future to the exclusion of all others.

RSA 21:6 (2012).

> **Residence**. Residence or residency shall mean a person's place of abode or domicile. The place of abode or domicile is that designated by a person as his principal place of physical presence for the indefinite future to the exclusion of all others. Such residence or residency shall not be interrupted or lost by a temporary absence from it, if there is an intent to return to such residence or residency as the principal place of physical presence.

RSA 21:6-a (2012). Notwithstanding the use of the words "resident" and "residence" in the titles of these sections, the language of the definitions makes clear that they are intended to describe the intensity of connection to a place that, <u>at a minimum</u>, satisfies the traditional test of domicile. The problem that gives rise to the proposed change in the law of residency set forth in HB 1264 is that the above definitions have been interpreted to impose requirements that go beyond the traditional definition of domicile. The result — counterintuitive as it may be — is that, notwithstanding the "resident" and "residence" labels used in their titles, to satisfy the current definitions of RSA 21:6 and :6-a requires a degree of connection to a place that is <u>greater</u> than that required to be domiciled in this state for voting purposes pursuant to RSA 654:1, I (2016).[2] To correct this problem, HB 1264 removes the words "for the indefinite future" from the text of RSA 21:6 and :6-a.

The genesis of the problem described above first came to light many years ago as the result of the decision in <u>Newburger</u>. <u>Newburger</u> was a class action suit brought by a Dartmouth College student on behalf of "all voting age students who wish to register in the communities where they reside while attending school but who intend to leave those communities upon graduation." <u>Newburger</u>, 344 F. Supp. at 560. When the student attempted to register to vote, he was denied "solely because he stated to voter registration officials that he intended to leave Hanover upon his graduation." <u>Id</u>. Although the statute then in effect granted the right to vote to an inhabitant "in the town in which he dwells and has his home," the voting authorities interpreted it to incorporate the common law of domicile, as embodied in <u>State v. Daniels</u>, 44 N.H. 383 (1862), which, like the terms of current RSA 21:6 and :6-a, required that the

---

[2] The connection to place defined by RSA 21:6 and :6-a, either with or without the amendments that would be effectuated if HB 1264 becomes law, satisfies the traditional test of domicile, rather than mere residency. However, because the legislature labels the relationship thus defined as "resident" or "residence," to avoid confusion we also use those terms when describing persons subject to RSA 21:6 and :6-a.

person have an intention to remain permanently or indefinitely in a particular place in order to qualify as a domiciliary. See Newburger, 344 F. Supp. at 560. The district court ruled that "the indefinite intention requirement is [not] necessary to serve a compelling [state] interest," and therefore that its application to the class "offends the equal protection clause of the Fourteenth Amendment." Id. at 563. In reaching this decision, the court observed that "the challenged New Hampshire law forces persons who are in every meaningful sense members of New Hampshire political communities to vote in communities elsewhere which they have long departed and with whose affairs they are no longer concerned, if indeed the former community still recognizes the right." Id.[3]

Subsequent to the Newburger decision, New Hampshire amended its law regarding domicile for voting purposes. Currently, that law is codified in RSA 654:1, I, and I-a (2016), which provide:

> I. Every inhabitant of the state, having a single established domicile for voting purposes, being a citizen of the United States, of the age provided for in Article 11 of Part First of the Constitution of New Hampshire, shall have a right at any meeting or election, to vote in the town, ward, or unincorporated place in which he or she is domiciled. An inhabitant's domicile for voting purposes is that one place where a person, more than any other place, has established a physical presence and manifests an intent to maintain a single continuous presence for domestic, social, and civil purposes relevant to participating in democratic self-government. A person has the right to change domicile at any time, however a mere intention to change domicile in the future does not, of itself, terminate an established domicile before the person actually moves.
>
> I-a. A student of any institution of learning may lawfully claim domicile for voting purposes in the New Hampshire town or city in which he or she lives while attending such institution of learning if such student's claim of domicile otherwise meets the requirements of RSA 654:1, I.

Until now, however, the legislature has never enacted legislation that removes the "for the indefinite future" language from RSA 21:6 and :6-a.

The difference between the definition of domicile under RSA 654:1, I, and I-a for voting purposes and, under RSA 21:6 and :6-a for most other purposes,

---

[3] Significantly, the Newburger court had no occasion to address what other consequences flow from persons being "in every meaningful sense members of New Hampshire political communities" so as to be entitled to vote.

is the issue underlying our decision in <u>Guare</u>. The plaintiffs in <u>Guare</u> were a group of mostly college students who desired to vote in New Hampshire but who did not believe that doing so required them thereafter to comply with other laws that apply to persons meeting the definitions of RSA 21:6 and :6-a. <u>Guare</u>, 167 N.H. at 659-60. They challenged language in the voter registration form which stated that they were required to do so. <u>Id</u>. As discussed above, we agreed with the plaintiffs that the form was confusing because it could be interpreted to mean that the definitions of "resident" and "residence" in RSA 21:6 and :6-a were the same as the definition of "domicile" in RSA 654:1, I. <u>Id</u>. at 664-65. The State conceded that such an interpretation was not accurate, <u>id</u>. at 663, and thus it was undisputed that even though the plaintiffs were not New Hampshire residents, they were entitled to vote in New Hampshire because they were domiciled here. <u>Id</u>. Accordingly, we concluded that the form could erroneously lead a prospective voter to believe that, by registering to vote, the person would be required to register his or her car in New Hampshire or to obtain a New Hampshire driver's license. <u>Id</u>. at 664-65.

HB 1264 redresses the confusion we identified in <u>Guare</u>. By removing the words "for the indefinite future" from RSA 21:6 and :6-a, HB 1264 makes the definitions of "resident" and "residence" as used in those statutes effectively the same as the definition of "domicile" as used in RSA 654:1, I, notwithstanding that the text of the amended version of RSA 21:6 and :6-a, on the one hand, and RSA 654:1, I, on the other, is not identical.[4]

B. Analysis

The submitted questions ask our opinion as to whether HB 1264 violates the equal protection clauses of the State or Federal Constitutions, <u>see</u> N.H. CONST. pt. I, art. 2; U.S. CONST. amend. XIV, or the right to vote guaranteed by the State Constitution, <u>see</u> N.H. CONST. pt. I, art. 11, either facially or as applied to students attending postsecondary educational institutions in New Hampshire.

When we interpret statutes already in effect, they are construed to avoid conflict with constitutional rights whenever reasonably possible. <u>Opinion of the Justices (Requiring Att'y Gen. to Join Lawsuit)</u>, 162 N.H. at 164. The same standard applies when we review proposed legislation, for it is understood that the legislation if enacted will be construed harmoniously with an individual's constitutional rights in any given case. <u>Id</u>. Thus, in reviewing proposed legislation, as when we review an existing statute, we presume it to be constitutional and will not declare it invalid except upon inescapable grounds. <u>Id</u>. This means that we will not hold the act to be unconstitutional unless a

---

[4] None of the parties who have submitted memoranda in support of or in opposition to HB 1264 disputes that the bill makes the definitions of "resident" and "residence" in RSA 21:6 and :6-a equivalent to the definition of "domicile" in RSA 654:1, I.

clear and substantial conflict exists between it and the constitution. Id. It also means that when doubts exist as to the constitutionality of a legislative act, those doubts must be resolved in favor of its constitutionality. Id.

Before we proceed to address specific arguments advanced in support of or in opposition to HB 1264, we observe that the fundamental issue posed by the questions submitted is whether the State or Federal Constitution requires the State of New Hampshire to permit persons to vote in this state who seek to claim residency here only for voting purposes while eschewing this status for other purposes. We have no hesitancy in opining that not only does New Hampshire have no such constitutional obligation but, quite the contrary, it has a compelling state interest not to do so.[5]

Although the submitted questions are directed to the equal protection clauses of both the State and Federal Constitutions, we have previously held that the Fourteenth Amendment provides no greater level of protection than does Part I, Article 2 of the New Hampshire Constitution, see In re Sandra H., 150 N.H. 634, 637 (2004), and we have applied an analysis identical to that used by the federal courts in considering claims raised under either constitution, see id. at 637-40. In addition, when considering claims raised under Part I, Article 11 of the State Constitution, we have used the same level of scrutiny analysis used in considering equal protection claims involving voting rights under the State and Federal Constitutions. See Akins v. Sec'y of State, 154 N.H. 67, 71-73 (2006). For these reasons, we conclude that the analysis required to address all of the submitted questions is the same, and that we therefore need not repeat the analysis separately for each question.

Furthermore, with respect to questions II(a) through (c), we answer these questions making the assumptions that the opponents of HB 1264 urge in challenging its constitutionality: that students who come to New Hampshire from other states to attend institutions of postsecondary education will comprise a substantial portion of those impacted by HB 1264 and that, if the bill becomes law, a significant number of this group who would have voted in New Hampshire in the absence of HB 1264 will not do so.

Part I, Article 11 of the New Hampshire Constitution provides in pertinent part:

> All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election. Every person shall be considered an inhabitant for

---

[5] Thus, we disagree with the intimation in our colleagues' opinion that there is a viable claim of "first impression" under either the State or Federal Constitution that a state must have a special, relaxed legal standard for domicile for voting purposes only.

10

the purposes of voting in the town, ward, or unincorporated place where he has his domicile.

The right to vote is a fundamental right. Akins, 154 N.H. at 71. Challenges to legislation affecting the right to vote are reviewed under differing standards depending upon the extent of the burden imposed on the right. See id. at 72. When a measure subjects voting rights to "severe" restrictions, it must be "narrowly drawn to advance a state interest of compelling importance." Guare, 167 N.H. at 663 (quotation omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." Id. (quotations omitted).

In urging affirmative answers to the submitted questions, those who oppose HB 1264 argue that it violates the State and Federal Constitutions because the bill imposes severe, or at least significant, restrictions on the right to vote that are not justified by either compelling, or even important, state interests, constitutes a prohibited "poll tax," and improperly discriminates against young voters. These arguments, however, misconstrue the purpose and effect of HB 1264.

HB 1264 does not affect the eligibility of persons to vote in New Hampshire elections. "The domicile test for determining where citizens may vote dominates the election laws of most states." Wit v. Berman, 306 F.3d 1256, 1261 (2d Cir. 2002) (citing Annotation, Residence of Students for Voting Purposes, 44 A.L.R.3d 797 § 2, at 801 (1972), for the proposition that "[i]t is a matter of virtually uniform recognition that, where state constitutional and statutory provisions limit the right to vote to the residents of a given geographical area, the term residence should be equated with the concept of domicile" (quotations omitted)). As discussed above, our state's definition of domicile for voting purposes is set forth in RSA 654:1, I, and nothing in HB 1264 purports to change the terms of that statute. Accordingly, all persons who qualify as domiciliaries of this state at the present time will remain qualified as domiciliaries if HB 1264 is enacted into law.

Instead, HB 1264 amends the definitions of "resident" and "residence" in RSA 21:6 and :6-a for purposes of the application of other provisions of New Hampshire law so that those definitions are equivalent to the definition of "domicile" found in RSA 654:1, I. Thus, for example, if HB 1264 becomes law, persons who are domiciled in New Hampshire for voting purposes also will be residents for purposes of the requirement that, if they own a motor vehicle, they must register their motor vehicle in New Hampshire, see RSA 261:45, I (Supp. 2017), and, if they drive, they must obtain a New Hampshire driver's license, see RSA 263:35 (2014). Viewed from this perspective, it is apparent that the premise of the opponents' arguments is that New Hampshire is required to have a special rule of domicile solely for voting purposes, so that

11

persons are allowed to vote here without assuming the other obligations of citizenship normally imposed. The opponents of the bill have not cited, nor are we aware of, any authority supporting such a requirement under the Federal Constitution or the constitution of any state.

Moreover, even assuming that the elimination of RSA 654:1, I's "special" domicile rule for voting purposes that would result from the enactment of HB 1264 could be viewed as imposing a "burden" on those voters who now are able to take advantage of that special rule, but who will no longer be able to do so once the definitions of "domicile" and "residence" are made equivalent, the State has a compelling justification for making that change. The Supreme Court and other courts have repeatedly emphasized that insuring that those who are permitted to vote are bona fide residents who share a community of interest with other citizens of the jurisdiction is a legitimate concern of the highest order.[6] See, e.g., Dunn v. Blumstein, 405 U.S. 330, 343-44 (1972)

---

[6] Our colleagues express concern that the State's interest in insuring that voters share a "community of interest" is "susceptible of abuse" and may serve as a pretext for "fencing out from the franchise a sector of the population because of the way they may vote," citing Dunn v. Blumstein and Evans v. Cornman in support. Those cases are, however, readily distinguishable and, in fact, support our conclusion that the State may constitutionally require that persons who desire to vote in New Hampshire be residents of the state. In Dunn, the Supreme Court reviewed a challenge to Tennessee's durational residence requirement under which, in addition to being a resident, a would-be voter was required to have been a resident for one year in the state and three months in the county in which he or she sought to register to vote. Dunn v. Blumstein, 405 U.S. 330, 334 (1972). As the Court expressly noted, the case did not present a challenge to Tennessee's "power to restrict the vote to bona fide Tennessee residents," but, rather, challenged the "additional durational residence requirement." Id. In determining whether Tennessee had shown that durational requirements were needed to further a sufficiently substantial state interest, the Court emphasized "the difference between bona fide residence requirements and durational residence requirements," reiterating that it had on several occasions "noted approvingly that the States have the power to require that voters be bona fide residents of the relevant political subdivision." Id. at 343. As the Court stated, "[a]n appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny. But durational residence requirements, representing a separate voting qualification imposed on bona fide residents, must be separately tested by the stringent standard." Id. at 343-44. In rejecting the State's proffered justification for the durational requirement as a means of determining whether certain persons in the community were bona fide residents, see id. at 351, the Court reasoned that it was "not very difficult for Tennessee to determine on an individualized basis whether one recently arrived in the community is in fact a resident," id., and that it was "unlikely that would-be fraudulent voters . . . would collect such objective indicia of bona fide residence as a dwelling, car registration, or driver's license." Id. at 352. In Evans, the Court noted that the State of Maryland's proffered reason for denying the vote to residents of a federal enclave within the state to "insure that only those citizens who are primarily or substantially interested in or affected by electoral decisions have a voice in making them" was "assumed . . . [to] be sufficiently compelling to justify limitations on the suffrage, at least with regard to some elections." Evans v. Cornman, 398 U.S. 419, 422 (1970). However, given that the residents of the enclave paid state income, gasoline, sales, and use taxes, and were required to register their automobiles in Maryland and obtain drivers' permits and license plates from the state,

(recognizing that "[a]n appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny"); Carrington v. Rash, 380 U.S. 89, 91 (1965) (stating that "Texas has unquestioned power to impose reasonable residence restrictions on the availability of the ballot"); Auerbach v. Rettaliata, 765 F.2d 350, 354-55 (2d Cir. 1985) (assuming that strict scrutiny standard applied, court upheld a state voter registration law that "distinguishes students by subjecting them, along with other groups likely to include transients, to the risk of a more searching inquiry than is applicable to prospective registrants generally" because, "[b]y identifying classes of persons whose residence for voting purposes and whose physical residence may not coincide," the statute "permissibly aids the State in ferreting out those whose claimed residence is not bona fide" (quotation omitted)).

Insuring a community of interest among voters and residents promotes confidence in political outcomes and guards against a distortion of the political community.  In Dunn, Justice Marshall aptly described one of the harms against which residency requirements are designed to protect:

> The impurities feared . . . all involve voting by nonresidents, either singly or in groups.  The main concern is that nonresidents will temporarily invade the State or county, falsely swear that they are residents to become eligible to vote, and, by voting, allow a candidate to win by fraud.  Surely the prevention of such fraud is a legitimate and compelling government goal.

Dunn, 405 U.S. at 345 (emphasis added); see also Wit, 306 F.3d at 1263 (noting, in a related context, that "some political organizations might well find it in their interests to attempt to register large numbers of persons with only marginal connections to the electoral district").  These potential aberrations in voting behaviors severely undermine notions of representative government.

Under RSA 654:1, I, persons entitled to vote in New Hampshire are those who not only are present in the state but who also regard New Hampshire as "that one place where [they], more than any other place, [have] established a physical presence and manifest[ ] an intent to maintain a single continuous presence for domestic, social, and civil purposes relevant to participating in democratic self-government."  RSA 654:1, I. Domicile is sometimes presumed in the state in which a person is registered to vote; at the very least, where a person votes is regarded as a "weighty factor" in the determination of one's domicile, see Bank One, Texas, N.A. v. Montle, 964 F.2d 48, 50 (1st Cir. 1992);

---

such residents were effectively treated as state residents to such an extent that it was unconstitutional to deny them the right to vote. Id. at 424-25.

13

see also Mass. Gen. Laws ch. 90, § 3½ (a)(11) (2012) (providing that a person claiming to be a nonresident and therefore exempt from registering his or her motor vehicle in Massachusetts "shall be deemed to be a resident of the commonwealth during any period in which such person . . . is registered to vote in the commonwealth"). Thus, a person who considers his or her connection to New Hampshire to be of the strength and character necessary to satisfy RSA 654:1, I, may constitutionally be expected to demonstrate such commitment by registering his or her motor vehicle in this state if the person has one, or obtaining a New Hampshire license if the person drives a motor vehicle. See Evans v. Cornman, 398 U.S. 419, 424 (1970) (noting, as a factor supporting its decision that Maryland could not constitutionally deny the right to vote to individuals living on a federal enclave within the state, that such persons "are required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State"). Indeed, because driving is ubiquitous and because every state regulates this activity, obtaining an in-state driver's license and registering one's vehicle in the state are universally recognized as important indicators that a person does in fact have his or her domicile in that state. See, e.g., Vlandis v. Kline, 412 U.S. 441, 448, 454 (1973); Washington v. Hovensa LLC, 652 F.3d 340, 344 (3d Cir. 2011); Bank One, 964 F.2d at 50; Brown v. Mutual of New York Life Ins. Co., 213 F. Supp. 2d 667, 669 (S.D. Miss. 2002).

The current incongruity between RSA 654:1, I, and RSA 21:6 and :6-a, permits all of the following persons, allegedly "nonresidents," as described in Newburger, to vote in New Hampshire without incurring responsibility for these and other obligations of state citizenship:

> [A] student candid enough to say that he intends to move on after graduation, a newly-arrived executive with a firm intention to retire to his Florida cottage at age 65, a hospital intern or resident with a career plan that gives him two or three years in New Hampshire, a construction worker on a long but time-limited job, an industrial or government trainee working up a precise career ladder, a research contractor on a project with a deadline, a city manager hired for a term, a military person on a term of duty, a hospital patient with a hoped-for goal of discharge.

Newburger, 344 F. Supp. at 563. As demonstrated by the references to its legislative history and to public remarks made by its legislative supporters as catalogued in memoranda submitted to us, correcting this imbalance of rights and responsibilities was precisely the purpose of HB 1264.

Because we determine that HB 1264 is justified by a compelling state interest, we next consider whether it is narrowly drawn to advance that interest. See Guare, 167 N.H. at 663; see also Akins, 154 N.H. at 73 (explaining that to satisfy strict scrutiny, the challenged law "must be necessary to the accomplishment of its legitimate purpose" (quotation

14

omitted)). We conclude that HB 1264 is narrowly drawn to advance the compelling governmental interest in insuring that voters are full members of the electoral community. The remedy effectuated by HB 1264 accomplishes this objective by equalizing the legal standard for domicile for voting purposes with the legal standard for residence for other purposes. In order to place voters and residents on equal footing as New Hampshire citizens, the legislation necessarily removes the distinction between the two. HB 1264 could be drawn more narrowly only if it left in place, to some degree, the dichotomy between the definitions so that some persons would be permitted to claim their domicile in New Hampshire for voting purposes yet avoid incurring other obligations of state citizenship that apply to all residents of the state. That would defeat the purpose of the legislation, and, as noted previously, we are aware of no authority supporting the proposition that there are any circumstances under which a state has a constitutional obligation to maintain a more relaxed legal standard for domicile for voting purposes than for other purposes. In short, unlike our colleagues, we discern no factual development that could have a bearing on whether the State can make the legal standard for domicile for voting purposes and the legal standard for residents for other purposes the same other than enacting legislation to do just that.

The opponents of HB 1264 contend that the bill discriminates against voters because its effect is to require a person who registers to vote to declare his or her residency in New Hampshire while a person who does not vote need not do so. This argument misses the mark for three reasons. First, the criteria for residency established under HB 1264, which is equivalent to that applied to voting under RSA 654:1, I, will apply to all persons subject to its terms, whether or not they seek to vote.

Second, to the extent the opponents suggest that the act of registering to vote is the event that will alert authorities to question a person's status as a bona fide resident, this may sometimes be true. But it is also true that similar scrutiny could result from many other kinds of interactions between the person and a governmental official of one kind or another. Such interactions might include, for example, applying for a local library card, dump permit, or some kind of government benefit. A person who does those things claiming to be a resident of New Hampshire, but produces an out-of-state driver's license as a form of identification, could well be subjected to official scrutiny as to the bona fides of his or her residency in a manner similar to that which would attend registering to vote.

Third, and most importantly, even if the act of registering to vote were assumed to be the most likely cause of an official inquiry designed to enforce compliance with the other responsibilities of residency, the State's compelling interest in insuring bona fide residency for voting purposes provides adequate justification for doing so. See Auerbach, 765 F.2d at 354-55. Simply put, the State may legitimately establish procedures by which persons who may be

15

tempted to insincerely claim domicile for voting purposes are discouraged from doing so by the prospect that such a claim can result in their incurring the full panoply of obligations imposed on all other state residents.[7]

The opponents of HB 1264 also claim that it constitutes an unconstitutional poll tax because it requires a person desiring to vote in New Hampshire to incur the expense of registering his or her motor vehicle in the state and obtaining a New Hampshire driver's license. There is no question that states may not condition the right to vote on the payment of a tax or fee. Harper v. Virginia Bd. of Elections, 383 U.S. 663, 666 (1966). However, the opponents of HB 1264 are mistaken when they claim that the bill conditions voting on the payment of motor vehicle fees or taxes. Rather, if a person becomes obligated to pay such fees or taxes, it will not be because the person votes, but because the person owns or drives a motor vehicle and is a resident of this state. Thus, a person who claims domicile in New Hampshire for voting purposes but who does not drive or own a motor vehicle will have no obligation to pay motor vehicle related fees. By the same token, a person who qualifies as a resident under the law proposed by HB 1264 and who does drive or own a motor vehicle will be subject to New Hampshire motor vehicle laws regardless of whether he or she votes.[8]

The opponents of HB 1264 suggest that, under the bill, persons who qualify as residents of the state but who drive without a New Hampshire license or own vehicles that are not registered in New Hampshire will be more likely to remain "under the radar screen," and thus avoid detection if they do not register to vote. This circumstance, the opponents claim, means that voting is the act that, as a practical matter, will trigger the obligation for such persons to incur motor vehicle taxes and fees, thus demonstrating that HB 1264 will effectively operate as a poll tax. The short answer to this argument is that, even if we were to assume the posited scenario to be accurate, we are aware of no constitutional principle that requires a state to forego its compelling interest in insuring that voters are bona fide residents in order to lessen the prospects of detection for those inclined to evade unrelated, yet entirely proper, requirements of state law.

---

[7] Indeed, not to correct this problem could be viewed as fundamentally inconsistent with a founding principle of our country — instead of "no taxation without representation" — current law effectively allows some to obtain representation without the payment of taxes or fees to which other similarly situated persons are subjected.

[8] The removal of the "for the indefinite future" language from RSA 21:6 and :6-a presumably will have consequences beyond the context of motor vehicle fees and taxes. It also may mean, for example, that if HB 1264 becomes law, some persons who currently may be able to avoid paying New Hampshire taxes on all their interest and dividends income (including that derived from out-of-state sources) based on a claim of nonresidency may no longer be able to do so. See RSA 77:3, I(a) (Supp. 2017) (requiring residents to pay tax on gross interest and dividends income "from all sources" that exceeds $2,400 per year (emphasis added)).

Finally, the opponents of HB 1264 assert that it unconstitutionally discriminates on the basis of age. The thesis appears to be that the legislation is aimed to discourage voting by college students, who as a group are likely to be younger than the voting population generally. However, HB 1264 is facially neutral and applies to all persons without regard to their age or student status, and the opponents do not claim that either age or student status is a suspect or protected class for constitutional purposes in this context. Further, as discussed previously, we have never interpreted our State Constitution's equal protection guarantee to provide greater protection than its Fourteenth Amendment counterpart, In re Sandra H., 150 N.H. at 637, and it is settled law that the latter affords protection only against intentional discrimination, Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 264-65 (1977). Indeed, to the extent the opponents of HB 1264 allege a nefarious legislative purpose, such a purpose "is not a recognized basis for declaring a statute unconstitutional," Libertarian Party N.H. v. State, 154 N.H. 376, 387 (2006), at least where, as here, the legislation does not, on its face, have the inevitable effect of disqualifying otherwise qualified voters, see United States v. O'Brien, 391 U.S. 367, 383-84 (1968).[9] Moreover, what opponents of HB 1264 characterize as the legislature's discriminatory intent to "disenfranchise voters" is based on circular reasoning, in that it assumes the point at issue. That is, the claim is premised entirely upon the assumption that the targeted persons have a constitutional right to vote in New Hampshire, when the very purpose of the legislation is to establish a more reliable system by which that question is determined. That those likely affected by the remedy thus fashioned may not be dispersed evenly by age among the population does not violate the constitutional rights of students or any other group who may be disparately impacted.

To summarize, if HB 1264 becomes law, out-of-state students who come to New Hampshire to attend a postsecondary institution, or others, as described in Newburger, who are similarly situated, will have a choice. If, while here, such persons come to regard New Hampshire as "home" and establish

---

[9] Our colleagues' opinion appears to be predicated in part on the view that if the purpose of HB 1264 were "found" (presumably by a trial judge) to be to disenfranchise students because of the way they may vote, the legislation would be invalid, thus meaning that New Hampshire would be required to continue to maintain a special, for-voting-purposes-only domicile rule. The unarticulated though necessary premise of this view is that such a finding would trump the State's compelling interest in ensuring that people who vote in New Hampshire actually do live here. But that is not how the law operates. On the contrary, a law that is narrowly tailored to further a compelling State interest is valid even when, for example, it specifically classifies persons on the basis of an otherwise forbidden distinction, such as race or ethnicity. See Miller v. Johnson, 515 U.S. 900, 920 (1995) (reasoning that because race was "the predominant, overriding factor" explaining the Georgia legislature's redistricting plan, that plan "cannot be upheld unless it satisfies strict scrutiny, our most rigorous standard of constitutional review" (emphasis added)); see also Grutter v. Bollinger, 539 U.S. 306, 343-44 (2003) (upholding narrowly tailored use of race as a factor in law school admissions decisions because it furthered the school's compelling interest in obtaining benefits of diversity).

sufficient attachment to the state to satisfy the requirements of domicile, then they will be entitled to vote here. But if New Hampshire does become their domicile, they also will incur the same obligations of state citizenship as are imposed on all other residents of the state. On the other hand, if such persons regard some other place as home and choose to maintain their domicile there, then that place, rather than New Hampshire, is where they must vote, but they also may not then be obligated to obtain a New Hampshire license in order to drive, or to register their motor vehicle in this state. There is nothing unfair or unconstitutional about state laws that require persons to make this choice.

III. Conclusion

For the reasons stated above, we answer "no" to each of the six questions submitted to us by the Honorable Governor and Executive Council.

Respectfully submitted,

Robert J. Lynn
Chief Justice

Anna Barbara Hantz Marconi
Associate Justice

Patrick E. Donovan
Associate Justice

18

House Bill (HB) 1264 proposes to amend the statutory definitions of "resident" and "residence" as set forth in RSA 21:6 (2012) and RSA 21:6-a (2012). Both the proponents and opponents of HB 1264 posit that the proposed amendments will render the statutory definitions of "resident" and "residence" equivalent to the statutory definition of "domicile." See RSA 654:1, I (2016). Assuming this to be the case for purposes of this advisory opinion, HB 1264, if it were to become law, would subject those who are "domiciled" in New Hampshire for voting purposes to the same legal requirements as those who are "residents" of the State — e.g., HB 1264 would require them to register their vehicles here, see RSA 261:45 (Supp. 2017), and to obtain a New Hampshire driver's license, see RSA 263:35 (2014).

The Governor and Council have asked us to opine upon two questions regarding the constitutionality of HB 1264. In the first question, we are asked whether, on its face, HB 1264 would violate either: (a) the equal protection clauses of the State or Federal Constitutions; or (b) Part I, Article 11 of the State Constitution. In the second question, we are asked whether HB 1264 would violate the foregoing constitutional provisions as applied to certain students attending a postsecondary institution in New Hampshire. We respectfully request to be excused from answering both questions.

Part II, Article 74 of the State Constitution "empowers the justices of the supreme court to render advisory opinions, outside the context of concrete, fully-developed factual situations and without the benefit of adversary legal presentations, only in carefully circumscribed situations." Duncan v. State, 166 N.H. 630, 640 (2014) (quotation omitted). When we issue such opinions, "we act not as a court, but as individual constitutional advisors to the legislative or executive branches." Opinion of the Justices (Appointment of Chief Justice), 150 N.H. 355, 356 (2003). "Because an opinion of the justices is an advisory opinion issued to a branch of the legislature, Governor, or Executive Council, and is not an opinion of the court in a litigated case, an opinion of the justices does not constitute binding precedent." Opinion of the Justices (Domicile for Voting Purposes), 167 N.H. 539, 542 (2015). The constitutional duty of the justices of the supreme court to give advisory opinions does not include answering legal questions that require resolving questions of fact. Id.

I

The first question concerns the facial constitutional validity of HB 1264. "A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged [law] violates the Constitution in all, or virtually all, of its applications." State v. Hollenbeck, 164 N.H. 154, 158 (2012) (quotation omitted). For HB 1264 to be facially unconstitutional, there must be "no set of

19

circumstances" under which it would be valid. Id. (quotation omitted); see United States v. Salerno, 481 U.S. 739, 745 (1987). In making such a determination, a court "must be careful not to go beyond [a law's] facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450 (2008).

When we interpret statutes already in effect, we construe them to avoid conflict with constitutional rights wherever reasonably possible. Opinion of the Justices (Certain Evidence in Sexual Assault Cases), 140 N.H. 22, 26 (1995). This principle also applies when the justices review the constitutionality of proposed legislation in an opinion of the justices "for it is understood that the statute if enacted will be construed harmoniously with an individual's constitutional rights in any given case." Id. at 26-27. Although HB 1264 has not yet been enacted, we must presume that it is constitutional and will not declare it to be invalid except upon inescapable grounds. See Opinion of the Justices (Requiring Att'y Gen. to Join Lawsuit), 162 N.H. 160, 164 (2011). However, the presumption of constitutionality does not apply to disputed facts that are critical to our constitutional analysis.

The first question asks whether HB 1264 is facially constitutional under Part I, Article 11 of the New Hampshire Constitution, the Equal Protection Clause of the New Hampshire Constitution, and/or the Federal Equal Protection Clause. See N.H. CONST. pt. I, arts. 2, 11; U.S. CONST. amend. XIV. Part I, Article 11 of the State Constitution provides, in relevant part: "All elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election." The court has previously held that the equal right to vote, as set forth in Part I, Article 11, is fundamental. Akins v. Sec'y of State, 154 N.H. 67, 71 (2006).

"Although the right to vote is fundamental, we do not necessarily subject any impingement upon that right to strict scrutiny." Guare v. State of N.H., 167 N.H. 658, 663 (2015). "Instead, we apply a balancing test to determine the level of scrutiny that we must apply." Id. We agree with our colleagues that the same balancing test applies under all three constitutional provisions implicated by the first question. See Libertarian Party N.H. v. State, 154 N.H. 376, 383-84 (2006); see also Crawford v. Marion County Election Bd., 553 U.S. 181, 190 (2008) (plurality opinion of Stevens, J.) (when evaluating an equal protection challenge involving the fundamental right to vote, the court applies a "balancing approach" under which it "identif[ies] and evaluate[s] the interests put forward by the State as justifications for the burden imposed by its rule"); Crawford, 553 U.S. at 204-05 (Scalia, J., concurring) (referring to the same "flexible" balancing approach as a rigid rule).

Pursuant to that balancing test, determining whether HB 1264 unconstitutionally infringes upon a complaining party's equal right to vote

20

requires weighing "the character and magnitude of the asserted injury to the rights that [a complaining party] seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the [complaining party's] rights." Akins, 154 N.H. at 72 (quotation and ellipsis omitted); see Burdick v. Takushi, 504 U.S. 428, 434 (1992). Under this balancing test, "the rigorousness of our inquiry into the propriety of [an] . . . election law depends upon the extent to which a challenged regulation burdens" a complaining party's equal right to vote. Burdick, 504 U.S. at 434. When those rights are subjected to "severe" restrictions, the law must withstand strict scrutiny to be constitutional. Akins, 154 N.H. at 72 (quotation omitted); see Burdick, 504 U.S. at 434. To withstand strict scrutiny, the law must be "narrowly drawn to advance a state interest of compelling importance." Guare, 167 N.H. at 663 (quotation omitted); see Burdick, 504 U.S. at 434. When an election law imposes only "reasonable, nondiscriminatory restrictions" upon the rights of voters, "the State's important regulatory interests are generally sufficient to justify the restrictions." Burdick, 504 U.S. at 434 (quotations omitted); see Guare, 167 N.H. at 663.

Our balancing test also includes a level of scrutiny that is similar to intermediate scrutiny. Guare, 167 N.H. at 667. Under that test, the State must "articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary, meaning it actually addresses, the interest set forth." Id. (quotation omitted).

In Opinion of the Justices (Domicile for Voting Purposes), the justices described the analysis required by the balancing test set forth above as "inherently fact-specific." Opinion of the Justices (Domicile for Voting Purposes), 167 N.H. at 542. In that opinion, the justices asked to be excused from answering whether proposed legislation violated Part I, Article 11, in part, because of the lack of a developed factual record. Id. at 543. As we explain below, the lack of a developed factual record in this case sufficiently inhibits our ability to answer the first question that we must respectfully request to be excused from answering it.

The proponents of HB 1264 assert that the bill imposes no burden on the right to vote. The opponents counter that the burden imposed is severe. Without a developed factual record, we cannot evaluate the merits of these conflicting claims. See id. at 542; see also Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (stating that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions"; rather, "a court must resolve such a challenge" by first considering the "character and magnitude of the asserted injury" to voting rights). However, for the purposes of this opinion, given the

lack of a factual record, like our colleagues, we assume that HB 1264 severely burdens the fundamental right to vote.[10]

That assumption triggers the requirement that HB 1264 satisfy the strict scrutiny standard, meaning that it must be "narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434 (quotation omitted); see Guare, 167 N.H. at 663. The lack of a factual record hampers our ability to determine whether HB 1264 satisfies this test.

When determining the State's interest in legislation under strict scrutiny, we must examine the "precise interests put forward by the State as justifications for the burden." Guare, 167 N.H. at 663 (quotation omitted). Here, the New Hampshire Senate does not explicitly argue that a compelling state interest justifies the burdens imposed on voters by HB 1264. The New Hampshire House of Representatives (House), on the other hand, asserts that those burdens are "necessary to accomplish the State's compelling interest in incentivizing voters to have a stable connection to the community where they exercise their franchise." For their part, opponents of HB 1264 contend that there is "absolutely no legitimate justification" for the proposed law, much less a compelling interest.

Our colleagues credit the interest advanced by the House and conclude that HB 1264 "serves the compelling state interest of insuring that those allowed to vote in this state share a community of interest with the population generally." We recognize that the State "has unquestioned power to impose reasonable residence restrictions on the availability of the ballot," and to require all voters to be "bona fide" state residents.[11] Carrington v. Rash, 380 U.S. 89, 91, 94 (1965). "An appropriately defined and uniformly applied requirement of bona fide residence may be necessary to preserve the basic conception of a political community . . . ." Dunn v. Blumstein, 405 U.S. 330, 343-44 (1972). But, if voters are, in fact, bona fide New Hampshire residents who intend to make New Hampshire their home, then "they, as all other qualified residents, have a right to an equal opportunity for political representation." Carrington, 380 U.S. at 94. While we agree with our colleagues that ensuring that voters share a "community of interest" is, indeed, a compelling state interest, it is also "susceptible of abuse." Dunn, 405 U.S. at 356 (referring to state's interest in limiting the franchise to voters who are knowledgeable about the issues). As the United States Supreme Court explained in Evans v. Cornman, we cannot "lightly . . . accept[ ]" a claim that a law is intended to "insure that only those citizens who are primarily or substantially interested in or affected by electoral decisions have a voice in

---

[10] It may be that, after development of a factual record, we would conclude that a less rigorous standard should apply. But we do not have the facts before us at this time.

[11] Notably, the proponents do not claim that the purpose or effect of HB 1264 is to prevent voter fraud. Nor do they assert that the voters impacted by it are not "bona fide" residents.

making them." Evans v. Cornman, 398 U.S. 419, 422 (1970) (citations omitted). "All too often, lack of a 'substantial interest' might mean no more than a different interest, and 'fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." Id. at 423 (quotation and brackets omitted); see id. at 426 (determining that precluding residents of a federal enclave from voting did not serve State's compelling interest in preserving political community because the residents were "just as interested in and connected with electoral decisions" as "their neighbors who live off the enclave").

Here, even if we assume that the interest asserted by the House constitutes the State's "precise" interest and that it is compelling, we are unable, absent a factual record, to determine whether HB 1264 is "narrowly drawn" to serve that interest. Burdick, 504 U.S. at 434 (quotation omitted). Determining whether a law is narrowly drawn requires evaluating whether "there are other, reasonable ways to achieve" the State's compelling interests "with a lesser burden on a constitutionally protected activity." Dunn, 405 U.S. at 343; cf. Grutter v. Bollinger, 539 U.S. 306, 341 (2003) (explaining that a race-conscious admissions program meets the "narrowly tailored" requirement if it does not "unduly harm members of any racial group"). Without a factual record, we are unable to make that determination. See Cruz v. Melecio, 204 F.3d 14, 22 (1st Cir. 2000) (explaining that to show that a ballot access requirement is narrowly drawn to advance a compelling governmental interest "requires the [government] to come forward with proof"). It is crucial that we hew closely to the important principles enunciated in Guare, Burdick, and Dunn, when, as in this case, a fundamental right is implicated and material facts are sharply disputed. To do otherwise undermines our credibility. Accordingly, because of the lack of a factual record, we respectfully ask to be excused from answering the first question. See Opinion of the Justices (Domicile for Voting Purposes), 167 N.H. at 543.[12]

II

The second question asks whether HB 1264 is constitutional under Part I, Article 11 of the State Constitution, the State Equal Protection Clause,

---

[12] To the extent that our colleagues argue that a voting rights challenge does not require a fact-intensive inquiry, we disagree. See Libertarian Party of NM v. Herrera, 506 F.3d 1303, 1308 (10th Cir. 2007) (describing the balancing test set forth in Anderson v. Celebrezze as involving a "highly fact specific inquiry"); see also Crawford, 553 U.S. at 202 (concluding, on the basis of evidence developed during pretrial discovery and facts of which the court could take judicial notice, that challenged statute did not impose "excessively burdensome requirements on any class of voters" (quotation omitted)). Our decision in Guare does not stand for a contrary proposition. See Guare, 167 N.H. at 660 (observing that the litigation at issue had been filed in September 2012 and that the parties had filed their summary judgment motions nearly two years later); id. at 665 (relying upon testimony of certain petitioners to conclude that language in voter registration form presented "more than the mere possibility of voter confusion" (quotation omitted)).

23

and/or the Federal Equal Protection Clause as applied to students attending a New Hampshire postsecondary institution who claim New Hampshire as their domicile for voting purposes, but who do not claim New Hampshire as their residence.

Just as we are unable to answer the first question without a developed factual record, so too are we unable to answer the second question. "An as-applied challenge . . . concedes that [a law] may be constitutional in many of its applications, but contends that it is not so under the particular circumstances of the case." Hollenbeck, 164 N.H. at 158 (quotation and brackets omitted). An as-applied challenge is, therefore, necessarily fact-intensive. Cf. Harris v. Mexican Speciality Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009) (explaining that, because an as-applied "challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider" when determining whether the challenge is ripe for adjudication).

Moreover, there are disputed issues of fact that may bear upon our analysis of whether HB 1264 is constitutional as applied to certain students attending New Hampshire postsecondary institutions. For instance, citing public statements made by legislators, opponents of the bill assert that HB 1264 is unconstitutional as applied because it was passed for an impermissible purpose — to disenfranchise college students who are New Hampshire domiciliaries and, thus, lawful voters[13] — and because it will have a disparate impact on those students by discouraging them from voting.[14] See Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 264 (1977) ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); cf. Mobile v. Bolden, 446 U.S. 55, 62 (1980) (plurality opinion) ("Our decisions . . . have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose."), superseded on other grounds by statute as stated in United States v. Dallas County Com'n, 739 F.2d 1529, 1532-33 (11th Cir. 1984). The proponents disagree. Whether the opponents' theory is viable

---

[13] We observe that college students have the statutory right to vote "in the New Hampshire town or city in which [they] live[ ] while attending [college]," RSA 654:1, I-a (2016), provided that they establish "a physical presence" in New Hampshire and "manifest[ ] an intent to maintain a single continuous presence" here "for domestic, social, and civil purposes relevant to participating in democratic self-government," RSA 654:1, I; cf. Newburger v. Peterson, 344 F. Supp. 559, 562-63 (D.N.H. 1972) (ruling that "indefinite intention" test, as applied to college students, violated the Federal Equal Protection Clause on the ground that the requirement that a voter intend to stay in New Hampshire indefinitely is not necessary to serve a compelling interest).

[14] See Dunn, 405 U.S. at 355, 356 n.28 (describing as "impermissible" excluding college students who, on completing their studies, "move on" (quotation omitted)); cf. Levy v. Scranton, 780 F. Supp. 897, 902 (N.D.N.Y. 1991) (denying plaintiffs' request to invalidate statute on ground that it was enacted "for the constitutionally impermissible purpose of fencing students out of the franchise" because statute "was enacted, at least in part, for the constitutionally permissible purpose of providing guidelines for determining bona fide residency").

under the State Equal Protection Clause or Part I, Article 11 is an issue of first impression for this court, and may also be an issue of first impression under the Federal Equal Protection Clause.

"Legislative motivation or intent is a paradigmatic fact question." Veasey v. Abbott, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (quotation omitted), cert. denied, 137 S. Ct. 612 (2017); see also Reno v. Bossier Parish School Bd., 520 U.S. 471, 489 (1997) (assessing discriminatory intent requires examining impact of the official action at issue as well as "the historical background" of the challenged law, "the specific sequence of events" leading up to passage of the law, and "legislative . . . history, especially any contemporary statements by members of the decisionmaking body" (quotations, ellipsis, and brackets omitted)); Metropolitan Housing Corp., 429 U.S. at 266 ("Determining whether . . . discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."); Levy v. Scranton, 780 F. Supp. 897, 902 (N.D.N.Y. 1991) (examining whether discriminatory purpose was motivating factor by reviewing transcripts of legislative debates and timing of legislation). Absent a developed factual record, we cannot assess the motivation of the New Hampshire Legislature for passing HB 1264. Nor can we assess whether, as some opponents suggest, even if HB 1264 is applied neutrally, it would have a disparate impact upon eligible college student voters. See Opinion of the Justices, 129 N.H. 290, 295 (1987) (explaining that the opinion of the justices "makes no attempt to anticipate particular issues that may arise only as the [proposed] statutory amendments are in fact applied, assuming enactment of the bill," because "[t]here is no practical opportunity to deal with the range of such possible issues in advance"). Therefore, because it would require us to give advice on issues of first impression without a developed factual record, we respectfully ask to be excused from answering the second question. See Opinion of the Justices (Domicile for Voting Purposes), 167 N.H. at 543.

Respectfully submitted,

_____
Gary E. Hicks
Senior Associate Justice

_____
James P. Bassett
Associate Justice

25

Bernstein, Shur, Sawyer & Nelson, P.A., of Manchester (Ovide M. Lamontagne on the memorandum), filed a memorandum on behalf of the New Hampshire House of Representatives in support of negative answers to the questions presented.

Lehmann Law Office, PLLC, of Manchester (Richard J. Lehmann on the memorandum), filed a memorandum on behalf of the New Hampshire Senate in support of negative answers to the questions presented.

Gordon J. MacDonald, attorney general (Francis C. Fredericks, assistant attorney general, and Lisa M. English, senior assistant attorney general, on the memorandum), filed a memorandum in support of the Justices answering the questions presented.

Wadleigh, Starr & Peters, PLLC, of Manchester (Eugene M. Van Loan, III on the memorandum), filed a memorandum on behalf of the Secretary of State.

Executive Councilor Christopher C. Pappas, of Manchester, and Executive Councilor Andru Volinsky, of Concord, filed a memorandum in support of the Justices declining to answer the questions presented or, in the alternative, in support of affirmative answers to the questions presented.

Dan Feltes, of Concord, and Paul Twomey, of Epsom, filed a memorandum on behalf of Senators Jeff Woodburn, Donna Soucy, and Dan Feltes, of the New Hampshire Senate, in support of the Justices declining to answer the questions presented or, in the alternative, in support of affirmative answers to the questions presented.

Gilles R. Bissonnette, of Concord, and Shaheen & Gordon, P.A., of Concord (William E. Christie and S. Amy Spencer on the memorandum), filed a memorandum on behalf of the American Civil Liberties Union of New Hampshire and the Fair Elections Center, in support of the Justices declining to answer the questions presented or, in the alternative, in support of affirmative answers to the questions presented.

Ray F. Chadwick, of Manchester, filed a memorandum on behalf of Granite State Taxpayers in support of negative answers to the questions presented.

Edward C. Mosca, of Manchester, filed a memorandum in support of negative answers to the questions presented.

Ed Naile, of Concord, filed a memorandum on behalf of Coalition of NH Taxpayers in support of negative answers to the questions presented.

Daniel Alain Richard, of Epsom, filed a memorandum.